IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LIZA KRANZ, on behalf of herself and all others similarly situated, | § § § |
| *Plaintiff*, | § § |
| vs. | § §  SA-18-CV-169-XR |
| MIDLAND CREDIT MANAGEMENT, INC., et al., | § § § § |
| *Defendants*. | |

**ORDER**

On this date, the Court considered Defendants' motion to dismiss for lack of jurisdiction (docket no. 87), Plaintiff's response (docket no. 89), and Defendants' reply (docket no. 91). After careful consideration, Defendants' motion is DENIED.

**BACKGROUND**

This lawsuit is brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Texas Debt Collection Practices Act ("TDCA"), TEX. FIN. CODE § 392.001 *et seq*. Docket no. 1. Plaintiffs Jeffrey Taggatz ("Taggatz") and Liza Kranz ("Kranz"), on behalf of themselves and all similarly situated, filed suit on February 19, 2019, complaining of the debt collection practices of Defendants[1] in 2017 and 2018.

In December 2013, Defendants obtained a judgment against Kranz on a consumer debt in the County Court at Law in Bexar County. *Id.* at 8. On October 12, 2017, Defendants attempted to

---

[1] Defendants initially included Midland Credit Management, Inc.; Asset Acceptance, LLC; Encore Capital Group, Inc; a group of six "lawyer defendants"; and John and Jane Does 1–100. The Doe defendants are those persons or business entities who "conspired with, engaged in, and oversaw the violative policies and procedures" used by the named Defendants. On March 20, 2020, the parties filed a stipulation of dismissal as to the lawyer defendants. Docket no. 74.

collect that debt from Kranz by mailing her a "Subpoena Letter." *Id.*; *see* docket no. 1-1 (titled "SUBPOENA FOR ORAL DEPOSITION AS AID TO ENFORCEMENT OF EXECUTION").[2] The header of each letter is styled as a typical case caption including the parties' names, a cause number, and the phrase "IN THE COUNTY COURT AT LAW NO. 3, BEXAR COUNTY, TEXAS." *Id.* They "commanded" a "Sheriff or constable of the State of Texas or other person authorized to serve and execute subpoenas" to summon Kranz to appear at a specific location in San Antonio at which Defendants would orally depose her "as an aid of enforcement of execution." *Id.* The letter warned that "[f]ailure by any person without adequate excuse to obey a subpoena served on that person may be deemed a contempt of the court from which the subpoena is issued…and may be punished by fine or confinement or both." *Id.* at 3. The letters indicate that they were "issued at the request of [Defendant Asset Acceptance]" and are signed by the six "lawyer defendants." *Id.* at 3. Plaintiffs allege, however, that the subpoena letters "were drafted, authorized, prepared, and sent by non-attorney debt collectors with no meaningful attorney review or involvement." *Id.* at 11.

Plaintiffs allege the statements contained in these letters are false and were created by a template Defendants used to mail similarly false letters to hundreds of others in Texas. Docket no. 1 at 9. Specifically, Plaintiffs allege that (1) the statement that a Texas court would hold the recipient "in contempt" was false; (2) the statement that the recipient may be punished by fine or confinement was false; and (3) Defendants never requested a person authorized to serve and execute subpoenas to serve the subpoenas (or any documents) in this case, so the subpoena's reference "commanding" a "Sheriff or constable" to serve the letter was false. *Id.* at 10. Further, Plaintiffs allege that these subpoena letters were sent via first-class U.S. Mail from Troy,

---

[2] The same letter was sent to Plaintiff Taggatz. *See* docket no. 1-2. Plaintiffs believe this letter was created by merging information specific to a debt with a template. Docket no. 1 at 9.

2

Michigan, an improper method of service of a subpoena under the Texas Rules of Civil Procedure. *Id.* at 11 (citing TEX. R. CIV. P. 176.5). Plaintiffs argue that because Defendants did not properly serve the subpoena letters, the threat of contempt in those letters was false, and because the letters falsely appeared to be valid court documents issued by an officer of the Texas courts, the letters were misleading to the "least sophisticated consumer." *Id.* Between the allegedly false or misleading statements and the improper service of the letters, Plaintiffs argue that Defendants had neither the intent nor the ability to enforce the threats contained in those letters, thereby violating § 1692e(5) which forbids debt collectors from making a "threat to take any action…that is not intended to be taken." *Id.*

Weeks after Plaintiffs received their subpoena letters, Defendants allegedly sent follow-up letters to Plaintiffs. *Id.* at 12; *see also* docket nos. 1-3, 1-4. Plaintiffs claim that these follow-up letters falsely implied that the original subpoena letters had the legal force of a proper subpoena. *Id.* at 13; *see also* docket no. 1-4 at 1 ("We recently sent you a subpoena which requires you to appear in-person to provide your sworn testimony at a deposition…."). As with the initial subpoena letters, Plaintiffs allege that the letters were prepared and sent by non-attorney debt collectors with no meaningful attorney review or involvement. Docket no. 1 at 13.

The follow-up letters also included a "Financial Disclosure Form" that Plaintiffs could return in lieu of attending the scheduled deposition. *Id.* That disclosure form noted that its purpose is to tell the "judgment creditor" what money or property might be exempt from the creditors' judgment. *Id.* at 3. Plaintiffs allege that this Financial Disclosure Form "is not a recognized or permissible form of discovery" in Texas. Docket no. 1 at 13.

At the named deposition date, Plaintiffs allege that, on information and belief, one or more lawyer defendants was present at a rented office space in San Antonio. *Id.* at 14. But, Plaintiffs

3

assert, these lawyers did not take the promised deposition (nor did they intend to), and none of the letter recipients "was allowed or permitted to provide 'sworn testimony.'" *Id.* Instead, Defendants handed the recipients the same "Financial Disclosure Form" that was attached to the follow-up letter. *Id.* Many "frightened consumers" thereafter filled out the forms and entered into payment agreements. *Id.* Plaintiffs Taggatz and Kranz, however, did not appear as commanded; they allege that "Defendants took no action to enforce their threat of pursuing 'contempt' by a Texas court or obtaining 'punish[ment] by fines or confinement" against either of them, or any other letter recipient who failed to personally appear as required in the subpoena letter. *Id.* at 15.

On February 1, 2018, Plaintiffs allege that Defendants served Plaintiff Kranz with an "Application for Appointment of Receiver After Judgment" which sought turnover relief. *Id.* at 15; *see also* docket no. 1-5. The motion explains that Defendants had made a "good faith effort to collect the judgment" but had been unsuccessful. Specifically, the motion references post-judgment discovery requests to discover the nature and extent of Plaintiff Kranz's assets, as well as unsuccessful attempts to contact Plaintiff Kranz. Docket no. 1-5 at 4.[3] An attached affidavit explains those efforts, though it does not reference the subpoena letter or the follow-up letter. *See id.* at 6. Instead, it describes Defendant as having "mailed post-judgment discovery to [Plaintiff Kranz] by regular first class mail to determine if [Plaintiff Kranz] possesses any property subject to execution sufficient to satisfy the judgment. [Plaintiff Kranz] was advised to respond to discovery within 30 days of its receipt." *Id.* Plaintiffs allege that "Defendants had no legal basis to obtain the relief sought in their Turnover Motion" and that Defendants have used the same template

---

[3] Plaintiffs' complaint does not allege this separate discovery request; however, attached to the turnover motion is a letter sent by Midland Credit Management to Plaintiff Kranz on August 3, 2016, over a year before Plaintiff Kranz alleges that the subpoena letter was sent to her. The letter includes the Financial Disclosure Form and says that if Plaintiff Kranz does not provide the requested form within 30 days, "we may issue a subpoena" that "would require you to make a personal appearance to testify to the questions outlined in the form." Docket no. 1-5 at 7.

"as leverage against Texas consumers to collect debts and successfully coerce payments from Texas consumers by threatening to obtain relief from Texas courts to which Defendants are not legally entitled." Docket no. 1 at 15–16. Further, Plaintiffs allege that the motion falsely stated that Defendants had "good faith to believe Kranz owned 'non-exempt property rights to present and future property, such as bank accounts or real property.'" *Id.* at 15.

A hearing was set for the turnover motion on February 16, 2018. *Id.* at 16. Plaintiff Kranz alleges that Defendants neither appeared nor had the intention of appearing for the hearing, which she attended with counsel. *Id.* At that hearing, the judge denied the turnover motion. *Id.*; *see also* docket no. 1-6 ("Order Denying Plaintiff's Application for Appointment of Receiver After Judgment"). Plaintiffs allege that the presiding judge similarly denied the same turnover motions filed against other Texas consumers. Docket no. 1 at 16.

In total, Plaintiffs brought thirteen claims under the FDCPA, fourteen claims under the TDCA, and a tort claim for unreasonable debt collection. Docket no. 1 at 19–25. Plaintiffs Taggatz and Kratz defined the class as those who received the same subpoena and follow-up letters. *Id.* at 17. Plaintiffs alleged that there were at least 600 members of the class. *Id.* at 18. The complaint defines the class as:

> Each natural person to whom any Defendant mailed a letter or notice to a Texas address during the Class Period which either: (1) appeared to compel the addressee's appearance at a deposition under threat of contempt for failure to appear including, but not limited to, letters substantially the same as Exhibits 1, 2, 3, or 4 to the Complaint [the subpoena and follow-up letters];  or (2) sought an Application for Appointment of Receiver After Judgment substantially the same as Exhibit 5 [the turnover motion].

Docket no. 1 at 17.

Plaintiffs allege that they "have incurred actual damages in the form of unnecessary expense and time, and [have] suffered emotion [sic] distress and upset" because of Defendants'

letters (the subpoena letter and follow-up letter). *Id.* at 16. Additionally, Plaintiff Kranz alleges she incurred additional damages due to the turnover motion, including the expense of attending the hearing. *Id.* Plaintiffs alleged that "[t]he conduct of Defendants invaded the rights of Plaintiff which are protected by the FDCPA, the invasion of which caused an injury-in-fact." *Id.* at 21.

On November 27, 2018, this Court granted Defendants' motion to compel arbitration and dismiss claims with respect to Plaintiff Taggatz. Docket no. 59. Taggatz's individual claims were ordered to arbitration, and his class claims were dismissed. *Id.* at 13. The case remained open pending resolution of Plaintiff Kranz's (hereinafter, "Plaintiff") claims. On November 25, 2019, the Court granted the parties' joint motion for referral to mediation (docket no. 65), which was conducted in two rounds in front of Magistrate Judge Elizabeth Chestney on December 5, 2019 and January 9, 2020. Mediation was unsuccessful. Docket no. 70. After that failed mediation, Plaintiff filed a motion to voluntarily dismiss without prejudice. Docket no. 73. In that motion, she sought an order, on behalf of herself and all others similarly situated, dismissing this action without prejudice. Further, she sought for the Court to toll the limitations period "so as to permit [Kranz] to litigate her claims in an action she will commence in a Texas state court." *Id.* at 1. Plaintiff filed the motion to dismiss, in part, because Defendants "refuse to abandon all standing challenges," and "[i]nstead of litigating standing, Plaintiff seeks to proceed to the merits by bringing her claims in a Texas state court where standing is not limited by the constraints imposed on a federal court under Article III…." *Id.* at 2.[4]

---

[4] On April 4, 2020, Defendants filed a motion for judgment on the pleadings. Docket no. 79. Plaintiffs thereafter filed a motion seeking for the Court to stay that motion until the Court ruled on Plaintiff's motion for voluntary dismissal. Docket no. 81. The Court agreed with Plaintiff and stayed Defendants' motion for judgment on the pleadings pending resolution of both the motion for voluntary dismissal and the expected challenge to standing that came once that voluntary dismissal was either withdrawn or denied. Docket no. 82.

On May 8, 2020, the Court conditionally granted the motion to dismiss. Docket no. 84. The Court found that the balance of factors to consider under Fed. R. Civ. P. 41(a)(2) counseled in favor of granting Plaintiff's motion for voluntary dismissal but found that such dismissal should be with prejudice. *Id.* at 5. The Court found that Defendants faced a "cognizable legal prejudice" with Plaintiff's motion filed only two months before trial was scheduled to begin, and where Defendants had already expended significant costs in litigating the case. *Id.* at 5–6. The Court further found that Plaintiff had not provided an adequate justification for the dismissal, as Defendants' "refus[al] to abandon all standing challenges" was insufficient given that Article III standing is a constitutional limitation that is not subject to waiver. *Id.* at 6. Accordingly, the Court found it appropriate to grant the motion to dismiss—as the Court must "freely do"—but found that doing so with prejudice was necessary to adequately cure the prejudice to and protect the interests of Defendants. *Id.* at 7. The Court nonetheless gave Plaintiff the opportunity to retract her motion rather than accept the dismissal with prejudice¸ *id.* at 8, which Plaintiff did on May 11. Docket no. 85. Thereafter, Defendants brought the present motion to dismiss for lack of jurisdiction, raising the expected challenge to standing. Docket no. 86.

## DISCUSSION

**I.     Standard of Review**

Defendants move to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) based on a purported lack of Article III standing. The Court must dismiss a cause for lack of subject matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *See Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). A motion to dismiss for lack of Article III standing is properly considered under Rule 12(b)(1). *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011). A motion to

dismiss for lack of jurisdiction under 12(b)(1) may be decided on: (1) the complaint alone; (2) the complaint supplemented by undisputed evidence in the record; or (3) the complaint supplemented by undisputed facts, plus the Court's resolution of disputed facts. *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). Unlike a 12(b)(6) motion, the district court is empowered to consider matters outside the Complaint and matters of fact that may be in dispute. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The party asserting jurisdiction—Plaintiff—bears the burden of proving that jurisdiction exists. *Id.*

## II. Application

Defendants argue that the Court should dismiss Plaintiff's individual claims because she lacks standing.[5] They next argue that the class claims should be dismissed because Plaintiff as the class representative lacks standing or, alternatively, because the unnamed class members themselves lack standing. The Court will consider individual and class standing in turn.

### A. Plaintiff Kranz's Individual Standing

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The standing doctrine concerns who may properly bring a suit in federal court; the "irreducible constitutional minimum" of such standing contains three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These elements are: (1) an injury in fact that is

---

[5] Defendants' motion argues that Plaintiff lacks standing for her FDCPA and TDCA claims. As to the unreasonable debt collection tort, Defendants raise that claim solely in a footnote in which they argue that the claim "is a non-starter" because post-judgment discovery "obviously does not constitute 'malicious harassment with the intention of inflicting mental anguish or physical harm.'" *See* docket no. 87 at 10, note 1. This is not a standing challenge; rather this is a 12(b)(6)-type argument—that Plaintiff fails to meet the "high threshold" she must satisfy for a claim for unreasonable debt collection. But this is not a 12(b)(6) motion, and accordingly, Plaintiff's standing with respect to the debt collection tort is not challenged in Defendants' motion, and the merits of the claim will be analyzed under Defendants' motion for judgment on the pleadings, where Defendants make—verbatim—the same argument they do in the instant motion to dismiss. *See* docket no. 79 at 3; *see Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986) ("It is inappropriate for the court to focus on the merits of the case when considering the issue of standing.").

(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury. *Croft v. Gov. of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560–61). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

      i. *Injury-in-Fact*

To establish the first element of standing, injury-in-fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The mere "violation of a procedural right granted by statute can be sufficient in *some* circumstances to constitute injury in fact," *id.* at 1548–49, but "deprivation of a procedural right without some concrete interest that is affected by the deprivation…is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Spokeo*, 136 S. Ct. at 1549 ("[Plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.").

The distinction, then, between a procedural and substantive violation is paramount. *Landrum v. Blackbird Enters., LLC*, 214 F. Supp. 3d 566, 571 (S.D. Tex. 2016) ("Whether a statutorily created right confers standing turns on whether the right is substantive or merely procedural."). Defendants here argue that Plaintiff has merely alleged a procedural violation and that the alleged violations here "do not create any real risk of harm—that is, abusive debt collection practices—that [the] debt collection laws at issue were meant to prevent." Docket no. 87 at 13 (citing *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020)). Defendants argue that

this is a "no harm no foul" scenario, focusing on Plaintiff's allegations that the subpoena was improperly served in violation of the Texas Rules of Civil Procedure. *Id.* at 14. But Plaintiff's allegation that the subpoenas were procedurally improper does not transform her claim into a claim for a procedural violation. On the contrary, Plaintiff alleges a *substantive* claim under the FDCPA; that is, she alleges that Defendants' letters were harassing and abusive (15 U.S.C. § 1692d) and were false or misleading (§ 1692e(2)-(13)). Plaintiff alleges that the letters were false or misleading, in part, because the subpoenas were not sent in accordance with Texas procedural rules. But that does not make Plaintiff's FDCPA claim a *procedural* claim. Her claim is a substantive one—the letters were false or misleading, in part, because they were not procedurally proper. *See* docket no. 89 at 18 ("The state [procedural] law is not the basis for the FDCPA violation. Instead, state law helps to explain why Defendants' statements were false, deceptive, or misleading.").

Nor does Plaintiff merely allege a procedural defect that rendered the communications misleading; that is to say, her claim is not limited to the procedural violations in the service of the subpoena. She alleges further substantive falsehoods contained within that subpoena, the follow-up letter, and the receiver motion. For instance, the subpoena was allegedly false addressed "TO: Any Sheriff or constable of the State of Texas…" when, in reality, Defendants never requested any such official to serve and execute the subpoenas. Docket no. 1 at 10. Moreover, Plaintiff alleges the letters are false in that they order the recipient to appear for an "oral deposition" when, in reality, Defendants had no intention of taking a deposition or "sworn oral testimony" as the previous communications stated. *Id.* at 13. She further argues that Defendants threatened to take legal action when they had no intention to do so. *Id.* Finally, she alleges the turnover motion falsely

states that Defendants had "good faith belief" that Plaintiff owned non-exempt property subject to collection. *Id.* at 15.

Her claim, therefore, is of a violation that created the risk of harm that the FDCPA was intended to prevent: protecting consumers from false, misleading, or unfair debt collection communications. *See Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy favoring dishonest, abusive, and unfair consumer debt collection practices…."); *see also Guerrero v. GC Servs. Ltd. P'ship*, No. CV 15-7449, 2017 WL 1133358, at *10 (E.D.N.Y. Mar. 23, 2017) ("[T]he majority of post-*Spokeo* decisions which have analyzed standing within the context of the FDCPA have determined that, unlike the FCRA section at issue in *Spokeo*, which contains only procedural requirements, the FDCPA creates a *substantive right*, the violation of which would itself give rise to a concrete injury."); *see also Ghanta v. Immediate Credit Recovery Inc.*, No. 3:16-cv-573-O, 2017 WL 1423597, at *4 (N.D. Tex. Apr. 18, 2017) ("In evaluating FDCPA claims post-*Spokeo*, courts have found that an alleged FDCPA violation is sufficient to confer standing because it establishes the consumer suffered the type of harm Congress intended to prevent—abusive debt collection practices.").[6] Defendants' argument—that Plaintiff's claimed injury-in-fact is that she

---

[6] The same holds true for Plaintiff's standing under the TDCA. The TDCA provides a state law remedy for wrongful debt collection actions, including improper threats of arrest or filing of criminal charges without proper court proceedings (TEX. FIN. CODE § 392.301(a)(5)-(6)), the threat that nonpayment will result in taking property without proper court proceedings (*id.* § 392.301(a)(8)); falsely representing a consumer's status in a judicial proceeding (*id.*), using a communication that falsely represents to be a court-approved document ( *id.* § 392.304(a)(10)); and generally the use of false representations or deceptive means to collect a debt (*id.* § 392.304(a)(19)). Plaintiff alleges that Defendant violated these various substantive provisions.

Under the TDCA, "[a] person may sue for: actual damages sustained as a result of a violation of this chapter." *Id.* § 392.403(a)(2). And according to the Fifth Circuit, "persons who have sustained actual damages from a [TDCA] violation have standing to sue." *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 473 (5th Cir. 2015). Actual damages sufficient to allege TDCPA standing include the "loss of money, time, and emotional distress" which Plaintiff here alleges. *Smith*, No. 3:18-CV-2449-D, 2019 WL 201839, at *4 (N.D. Tex. Jan. 15, 2019); docket no. 1 at ¶ 111 (alleging actual damages of "unnecessary expense, time, and…emotional distress"). Plaintiff, therefore, has standing to bring her TDCA claims. *See*

would be required to pay a court-ordered judgment and that such an injury is not what the debt collections laws are intended to prevent—is misguided because Plaintiff's alleged injury is not that she would be forced to pay her judgment; rather, her alleged injury is that she received false, misleading, and deceptive debt collection communications, and that is precisely what the debt collection laws are, in part, intended to prevent. *See Long v. Fenton & McGarvey Law Firm, P.S.C.*, 223 F. Supp. 3d 773, 777 (S.D. Ind. 2016) ("Plaintiff alleges that she received deficient and misleading information…which is a harm defined and made cognizable by FDCPA. Because the alleged injury is a defined and cognizable harm under the FDCPA, it is more than a bare procedural violation of the statute."); *Reed v. Receivable Recovery Servs., LLC*, No. 16-12666, 2017 WL 1399597, at *6 (E.D. La. Aug. 28, 2017) ("[W]here…the plaintiff alleges that he has been victimized by harassment and false or misleading debt collection communications, he seeks to vindicate his *substantive* right to be free from debt collector abuse, which sufficiently alleges a concrete and particularized injury in fact.") (emphasis added).

Even to the extent Plaintiff's claims may be considered procedural—such as the alleged failure to conduct "meaningful attorney review" of the letters—the Court finds that this is one of the circumstances identified in *Spokeo* in which "the violation of a procedural right granted by statute [is] sufficient…to constitute injury in fact." *Spokeo*, 136 S. Ct. at 1549. Since *Spokeo*, courts have routinely found that FDCPA violations—*including procedural violations*—are sufficient to confer standing, even with no additional harm alleged aside from the statutory violation. Indeed, "[c]ourts across the country, including in the Fifth Circuit, have considered whether a violation of the FDCPA itself confers standing on a plaintiff, and they have answered that question in the affirmative." *Smith v. Moss Law Firm, P.C.*, No. 3:18-CV-2449-D, 2020 WL

---

*Ozmun v. Portfolio Recovery Associates, LLC*, No. A-16-CA-940-SS, 2017 WL 3140660, at *6 (W.D. Tex. July 24, 2017) (finding TDCA standing because mental anguish is a form of actual damages).

12

584617, at *4 (N.D. Tex. Feb. 6, 2020) (internal quotations omitted). In *Sayles*, the Fifth Circuit affirmed a district court holding that the plaintiff had standing to bring an FDCPA claim where the defendant's alleged violations exposed the plaintiff to a risk of harm protected by the FDCPA. *Sayles v. Advanced Recovery Sys., Inc.*, 865 F.3d 246, 250 (5th Cir. 2017); *see also Tourgeman v. Collins Fin. Servs. Inc.*, 755 F.3d 1109, 1116 (9th Cir. 2014) ("[T]he violation of [the] right not to be the target of misleading debt collection communications…constitutes a[n] injury under Article III.").[7]; *Busby v. Vacation Resorts Int'l*, No. H-18-4570, 2019 WL 669641, at *5 (S.D. Tex. Feb. 19, 2019) ("Most district courts in the Fifth Circuit have denied motions to dismiss based on insufficient allegations of injury in FDCPA cases."); *Thomas v. John A. Youderian Jr., LLC*, 232 F. Supp. 3d 656, 671 (D.N.J. 2017) ("Deprivation of the right to be free of false or deceptive collection information, with the attend risk of economic injury, is an interest recognized by the [FDCPA], and one reasonably rooted in the traditions of the common law.").[8]

Thus, even to the extent Plaintiff's allegations *are* mere procedural violations, the violation of the FDCPA in this case created the real risk of harm to Plaintiff's right to be free from abusive debt collection practices, such as false, deceptive, or misleading representations, the very harm Congress sought to avoid through enacting the FDCPA. *Hamilton*, 310 F.3d at 392. This is particularly true where the communications in this case contained allegedly false threats of fine or imprisonment for failure to comply with the purported subpoena, threats which Plaintiff alleges

---

[7]   This Court, too, has previously found that a violation of the FDCPA which creates a "real risk of harm" is sufficient to constitute standing. *See Hackler v. Tolteca Enters., Inc.*, No. SA-18-CV-911-XR, 2019 WL 7759523, at *2 (W.D. Tex. Sept. 9, 2019).

[8]   Circuit courts have upheld the district courts' refusal to dismiss on standing challenges in the post-*Spokeo* context. *See, e.g. Sayles*, 865 F.3d at 250; *Papetti v. Does 1-25*, 691 F. App'x 24, 26 (2d Cir. 2017); *Church v. Accretive Health, Inc.*, 654 F. App'x 990, 995 (11th Cir. 2016) ("[The plaintiff] has sufficiently alleged that she has sustained a concrete—i.e., 'real'—injury because she did not receive the allegedly required [FDCPA] disclosures."); *Ben-Davies v. Blibaum & Assocs.*, 695 F. App'x 674, 676 (4th Cir. 2017) (finding standing where alleged FDCPA violations led to "emotional distress, anger, and frustration").

caused her "emotional distress and upset" as well as the loss of time and money—and threats that, if true, would squarely violate the FDCPA's prohibition on "representation[s]…that nonpayment of any debt will result in the arrest or imprisonment of any person…unless…the debt collector or creditor intends to take such action." Docket no. 1-1 at 3. *See Buchholz*, 946 F.3d at 864 (contrasting the lack of injury in that case to scenarios where, for example, "the debt collector threatened the consumer with arrest and criminal prosecution unless the consumer paid promptly"); *Ozmun v. Portfolio Recovery Assocs., LLC*, No. A-16-CA-940-SS, 2017 WL 3140660, at *5–6 (W.D. Tex. July 24, 2017) (finding standing from violation of same FDCPA provisions at issue here); *Hsu v. Enhanced Recovery Co., LLC*, No. 1:17-CV-128-RP, 2017 WL 4310643 (W.D. Tex. July 24, 2017) (finding that the plaintiff did not need to allege an additional harm beyond merely alleging an FDCPA violation).[9] Accordingly, the Court finds that Plaintiff has established injury-in-fact because the FDCPA provides the right to receive truthful, non-misleading communications from a debt collector, and Plaintiff alleges that Defendants violated that right, a practice clearly prohibited under the FDCPA.

ii. *Traceability*

The second element of Article III standing—traceability—requires there be a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third

---

[9]   Some courts have also found that allegations of emotional distress and anxiety, like Plaintiff's allegations here, themselves constitute sufficient "additional" injury sufficient to confer standing. *See, e.g. Smith*, 2020 WL 584617, at *5 ("Alternatively, even if [the defendant] is correct that, under *Sayles*, [the plaintiff] is required to show, *in addition* to the FDCPA violation itself, that he suffered a "real risk of harm," [the plaintiff] has met that burden" by producing evidence of anxiety, worry, and attendant legal costs. *See also Ben-Davies*, 695 F. App'x at 676 (holding that emotional distress is a concrete injury sufficient to support standing in an FDCPA case); *see also Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1041 (D. Minn. 2010) ("A consumer who has suffered emotional distress has suffered [actionable damage under the FDCPA] even if the emotional distress was not severe."). Thus, even to the extent Plaintiff *does* need to prove an injury in addition to the violation of the FDCPA, she has done so.

party not before the court." *Lujan*, 504 U.S. at 560. The traceability, or causation, element "asks whether the line of causation between a plaintiff's injury and the defendants' alleged wrongdoing is 'too attenuated.'" *Hollis v. Lynch*, 121 F. Supp. 3d 617, 628 (N.D. Tex. 2015) (quoting *Hanson*, 800 F.2d at 1385). The standard for establishing such traceability for standing purposes is less demanding than the standard for proving tort causation. *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, c, 72 (3d Cir. 1990).

Defendants argue that Plaintiff cannot establish traceability because *she*, not Defendants, caused the injury in her alleged non-payment of the underlying judgment. Docket no. 87 at 16 (arguing that Plaintiff's injuries are "self-inflicted" and "not traceable to anyone but her"). In support, Defendants cite to a recent Sixth Circuit case which found a lack of traceability in an FDCPA case where the plaintiff's failure to pay his debt was the "cause" of his alleged injury, anxiety. *See Buchholz*, 946 F.3d at 867 ("The cause of that anxiety falls squarely on Buchholz because *he* chose not to pay his debts—and now fears the consequences of his delinquency."). Plaintiff responds that her injuries did not flow from the underlying debt but rather "directly flowed from Defendants' misrepresentations" that Plaintiff could face contempt, fine, or jail time for failure to comply with the purported subpoena. Docket no. 89 at 8. Plaintiff's injuries "were not self-inflicted but flowed from Defendants' false statements." *Id.* at 9.

The Court finds Defendants' arguments here difficult to square with the existence of the FDCPA as a remedial statute. If a plaintiff lacks standing because he or she is at fault for the underlying debt, then rare indeed would be the case in which a plaintiff would have standing under the statute, save for certain cases in which the defendant erroneously sends a collections letter to a plaintiff who has no such underlying debt. Such a reading of the statute is hard to reconcile with the broad remedial purpose of the FDCPA and the provisions which prohibit far more than merely

15

sending letters to consumers who do not actually have any debt. *See Obduskey v. McCarthy & Holthus, LLP*, 139 S. Ct. 1029, 1041 (2019) (Sotomayor, J., concurring) (describing the "broad, consumer-protective purposes" of the FDCPA); *see also Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 511 (5th Cir. 2016) (explaining that because "Congress clearly intended the FDCPA to have a broad remedial scope," it "should therefore be construed broadly and in favor of the consumer."). Accepting Defendant's strict understanding of traceability would, for instance, render meaningless the prohibition on collecting an amount not "expressly authorized by the agreement creating the debt." 15 U.S.C. § 1692f(1). Such a prohibition assumes the preexistence of a valid underlying debt, a debt which—by definition—arises due to an underlying obligation owed by the debtor-plaintiff. *See id.* § 1692a(5) (defining "debt"). The prohibition in § 1692f(1) would be meaningless if the very existence of that valid debt simultaneously provided a precondition to a cause of action while also prohibiting the debtor-plaintiff from ever establishing standing because she "caused" the debt to arise. The "broad remedial scope" of the FDCPA does not counsel in favor of adopting such a constricted understanding of traceability, particularly where the burden of establishing traceability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

Further, Defendants' reliance on *Buchholz* is misguided. An analysis of traceability requires there be a connection "between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Some courts, including the Sixth Circuit in *Buchholz*, explain that, although the plaintiff's burden in establishing such traceability is indeed "relatively modest," there are still "cases when a plaintiff will fail to meet the traceability standard, such as when an injury is "so completely due to the [plaintiff's] own fault as to break the causal chain." *Buchholz*, 946 F.3d at 866 (citing *Petro-Chem Processing, Inc.*

*v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989)). But in *Buchholz*, "the anxiety [the plaintiff] alleges is not because of anything [the defendant] wrote." *Id.* Such is not the case here, where the complained-of conduct is *entirely* what Defendants wrote: the alleged misrepresentations and falsehoods in Defendants' various collection letters, including the purportedly false threat of imprisonment for failure to comply with the subpoena. Plaintiff does not complain that she might be forced to pay the debt—a debt that is clearly traceable to her—but rather, Plaintiff complains that Defendants' methods of seeking such collection violate the debt collection statutes. The existence of Plaintiff's debt did not cause Defendants to send allegedly false and misleading letters; Defendants' own conduct did. Therefore, Plaintiff has established traceability.[10]

**B. Class Standing**

Defendants next argue that Plaintiff's class claims should be stricken for lack of standing. Docket no. 87 at 16. Defendants argue that the proposed class lacks standing because a "class cannot be certified if members of the putative class would not have had standing to individually sue the defendants." Docket no. 87 at 18.[11] That is to say, if the class were to be certified under Rule 23, that Rule "does not—and indeed cannot—obviate constitutional standing requirements," thereby depriving Defendants of a defense—standing—that they would otherwise have. *Id.* (citing 28 U.S.C. § 2072(a), or the Rules Enabling Act, which states that the Federal Rules of Civil Procedure "shall not abridge, enlarge, or modify any substantive right").[12]

---

[10] The parties do not dispute whether Plaintiff's injuries can be redressed by a favorable decision, the third element of standing. That is because "this Court could provide Plaintiff with the relief she desires by ordering Defendant[s] to pay her the requested statutory damages, a remedy which is available to her pursuant to § 1692k. Therefore, it is likely that Plaintiff's injury would be 'redressed by a favorable decision.'" *Hackler*, 2019 WL 7759523, at *2 (citing *Lujan*, 504 U.S. at 560).

[11] Because the Court found that Plaintiff has individual standing, the Court does not address Defendants' alternative argument that the class lacks standing because its representative, Plaintiff, lacks standing. Docket no. 87 at 17.

A recent Fifth Circuit opinion casts doubt on the validity of Article III standing for some FDCPA classes. *See Flecha v. Medicredit, Inc.*, 946 F.3d 762 (5th Cir. 2020). The facts of *Flecha* are similar to this case, though the procedural posture differs; there, the plaintiff brought suit over a letter from Medicredit that the plaintiff claimed gave her the impression she would be sued to collect the debt and that, as in this case, the letter violated the FDCPA because the defendant "in fact never intended to sue her over the unpaid" debt. *Id.* at 765. The trial court, after disposing of summary judgment motions, certified a class consisting of:

> [A]ll persons in Texas from whom Medicredit attempted to collect and who received a form collection letter from Medicredit containing these statements:
>
>> Your seriously delinquent Seton Medical Center Hays account remains unpaid despite past requests for payment.
>>
>> At this time, a determination must be made with our client as to the disposition of your account. Your failure to cooperate in satisfying this debt indicates voluntary resolution is doubtful. However, if it is now your desire to clear your account, you need to promptly remit the balance in full.

*Id.* The defendants thereafter appealed that class certification under Rule 23(f). *Id.*

The Fifth Circuit reversed, finding that the plaintiff failed to meet her burden of establishing commonality because the letters to *some* class members may not have been misleading to the extent the defendant may have actually intended to sue those particular consumers. *Id.* at 767 ("Every member of the putative class received the same allegedly threatening letter from Medicredit. But the FDCPA penalizes *empty* threats, not all threats. So the letter alone is insufficient to certify a class.").

The Court then, in dicta, discussed the "substantial questions of Article III standing" presented by the putative class. *Id.* at 764. The Court remarked that "[o]ur court has not yet decided whether standing must be proven for unnamed class members, in addition to the class representative" unlike "some circuits [which] have held that 'no class may be certified that contains

members lacking Article III standing.'" *Id.* at 768 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). It continued:

> That is significant, because there are undoubtedly many unnamed class members here who lack the requisite injury to establish Article III standing. After all, the putative class sweeps in "all persons in Texas…who received a form collection letter" from Medicredit. As a result, the putative class inevitably includes people who received the letter, but ignored it as junk mail or otherwise gave it no meaningful attention—and therefore lack a cognizable injury under Article III.

*Id.* But, the Court concluded, "we do not reach the issue" of Article III standing for the class because there "is no need to answer the latter question [standing] if the class fails under the former [Rule 23]." *Id.* at 768–69.[13]

*Flecha* does raise questions as to the eventual viability of Plaintiff's proposed class, at least as it is currently defined, where there well may be unnamed class members who would not have standing. But Plaintiff has not yet sought class certification, and thus a determination as to the standing of any such class is premature, particularly where Plaintiff may seek to redefine her proposed class so as to avoid the issues raised in *Flecha*. The Supreme Court has noted that the resolution of class certification issues is "logically antecedent to the existence of any Article III issues." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) ("Ordinarily, of course, this or any Article III court must be sure of its own jurisdiction before getting to the merits…But the class certification issues are…logically antecedent to Article III concerns."). The Fifth Circuit in *Flecha* itself remarked that a determination of the *class representative's* standing must be addressed prior to deciding class certification—which the Court here has done—but then notes that "if it is only the unnamed class

---

[13] Judge Oldham, in a concurrence, would have decided the standing question first. He remarked that "we must consider unnamed class members' standing before adjudicating the merits of their claims." *Flecha*, 946 F.3d at 771. He agreed that "countless unnamed class members lack standing" and would have held that "that lack of standing is sufficient to decide the case." *Id.* at 770.

19

members who present a standing problem, then we are duty-bound to follow *Amchem* and *Ortiz*" by deciding class certification before addressing the class members' standing. *Flecha*, 946 F.3d at 769. Under those cases, "there is no need to analyze the Article III standing of the unnamed members of a non-existent class." *Id.* When Plaintiff seeks to certify a class, Defendant may then raise its challenges to the class members' standing based on *Flecha* and the arguments set forth in this motion to dismiss.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (docket no. 87) is DENIED. The Court previously stayed Plaintiff's deadline to respond to Defendants' motion for judgment on the pleadings. *See* docket no. 82. Plaintiffs are hereby ORDERED to respond to that motion within fourteen (14) days of this order.

It is so ORDERED.

SIGNED this 10th day of July, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE